## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

I.A.* and E.B.,*                                     )
Western Region Detention Facility                    )
220 West C Street                                    )
San Diego, CA 92101;                                 )
                                                     )
L.C.* and her minor son, M.X.* (by and through his   )
mother),                                             )
c/o 125 Broad Street, 18th Floor                     )
New York, NY 10004;                                  )
                                                     )
L.A.*,                                               )
Bergen County Jail                                   )
160 S River St,                                      )
Hackensack, NJ 07601;                                )
                                                     )
A.L.G.* and her minor daughter, A.G.* (by and        )
through her mother),                                 )
c/o 125 Broad Street, 18th Floor                     )
New York, NY 10004;                                  )
                                                     )
N.B.*                                                )
c/o 125 Broad Street, 18th Floor                     )
New York, NY 10004;                                  )
                                                     )
Tahirih Justice Center                               )
c/o 6402 Arlington Blvd., Suite 300                  )
Falls Church, VA 22042;                              )
                                                     )
                        *Plaintiffs*,                )
                                                     )
             v.                                      )
                                                     )
WILLIAM BARR, Attorney General of the United         )
States, in his official capacity,                    )
950 Pennsylvania Avenue, NW                          )
Washington, DC 20530;                                )
                                                     )
U.S. DEPARTMENT OF JUSTICE,                          )
950 Pennsylvania Avenue, NW                          )
Washington, DC 20530;                                )
                                                     )
JAMES MCHENRY, Director of the Executive             )

Case: 1:19−cv−02530
Assigned To : Kelly, Timothy J.
Assign. Date : 8/21/2019
Description: GEN CIV (E−DECK)

RECEIVED

AUG 1 9 2019

Clerk, U.S. District and
Bankruptcy Courts

Office for Immigration Review, in his official
capacity,
5107 Leesburg Pike
Falls Church, VA 22041;                          )
                                                 )
                                                 )
                                                 )
EXECUTIVE OFFICE OF IMMIGRATION                  )
REVIEW,                                          )
5107 Leesburg Pike                               )
Falls Church, VA 22041;                          )
                                                 )
KEVIN K. MCALEENAN, Acting Secretary of the      )
Department of Homeland Security, in his official )
capacity,                                        )
245 Murray Lane, SW                              )
Washington, DC 20528;                            )
                                                 )
U.S. DEPARTMENT OF HOMELAND SECURITY,            )
245 Murray Lane, SW                              )
Washington, DC 20528;                            )
                                                 )
KENNETH T. CUCCINELLI, Acting Director of        )
U.S. Citizenship and Immigration Services, in his )
official capacity,                               )
245 Murray Lane, SW                              )
Washington, DC 20528;                            )
                                                 )
U.S. CITIZENSHIP AND IMMIGRATION                 )
SERVICES,                                        )
20 Massachusetts Ave NW,                         )
Washington, DC 20529;                            )
                                                 )
MARK MORGAN, Acting Commissioner of U.S.         )
Customs and Border Protection, in his official   )
capacity,                                        )
1300 Pennsylvania Ave, NW                        )
Washington, DC 20229;                            )
                                                 )
U.S. CUSTOMS AND BORDER PROTECTION,              )
1300 Pennsylvania Ave, NW                        )
Washington, DC 20229;                            )
                                                 )
MATTHEW ALBENCE, Acting Director of              )
Immigration and Customs Enforcement, in his      )
official capacity,                               )
500 12th Street, SW                              )
Washington, DC 20536;                            )

|  | ) |
|  | ) |
|  | ) |
|  | ) |
| U.S. IMMIGRATION AND CUSTOMS | ) |
| ENFORCEMENT, | ) |
| 500 12th Street, SW | ) |
| Washington, DC 20536; | ) |
|  | ) |
|  | ) |
| *Defendants.* | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Refugee Act, Immigration and Nationality Act, Administrative Procedure Act, Trafficking Victims Protection Reauthorization Act)

[*] Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

## INTRODUCTION

1.      The United States has a longstanding commitment under domestic and international law to protect people fleeing persecution from further harm.

2.      The Immigration and Nationality Act ("INA") reflects Congress's carefully considered balance between effectuating our broad, historic commitment to international humanitarian law principles in the context of our asylum system and ensuring fairness and efficiency in the process.  In crafting our asylum laws, Congress sought to implement the principles in the 1951 Refugee Convention, which was designed to avoid the horrors visited on refugees around World War II.

3.      As part of our nation's commitment to the protection of people fleeing persecution and consistent with our international obligations, it is longstanding federal law that merely transiting through a third country is not a basis to categorically deny asylum to refugees who arrive at our shores.

4.      Specifically, Congress expressly provided in the INA that a noncitizen is ineligible for asylum in the United States only if she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).  The concept of firm resettlement—which involves far more than a mere transitory relationship with a third country— dates back to international agreements crafted after World War II, and takes into account the ties an individual fleeing persecution formed with another country and his or her particular ability to enjoy safety and legal protection there.

5.      Moreover, Congress expressly spoke to when an asylum seeker may be removed to a third country and required to seek protection there. The safe third country provision of asylum law permits such a bar to asylum only where: (1) the United States and the other country

have entered into a bilateral or multilateral agreement, (2) the removal is pursuant to that agreement, and (3) there is a determination that the asylum seeker would not face persecution and "would have access to a full and fair procedure for determining a claim to asylum" in that country.  8 U.S.C. § 1158(a)(2)(A).

6.      Indeed, Congress made clear that "any alien" may apply for asylum regardless of where they enter the United States, "whether or not at a designated port of arrival."  8 U.S.C. § 1158(a)(1).  All asylum seekers who are not Mexican or Canadian and who enter the United States by land necessarily transited through another country before reaching the United States. Congress therefore guaranteed that they should be able to seek asylum free of any categorical restriction based on their route to the United States.

7.      Together, these provisions illustrate the careful balance Congress struck between protecting vulnerable individuals from harm and sharing the burdens of asylum processing with other countries in which safety and fair processing can be assured and are appropriate.  They make clear Congress's decision that a noncitizen's transit or even residence in a third country can only justify a denial of protection in the United States under specific, narrow circumstances.

8.      Despite Congress's clear commands, on July 16, 2019, the Attorney General and Acting Secretary of Homeland Security promulgated an interim final rule ("Rule") providing that noncitizens who transit through another country prior to reaching the southern border of the United States are ineligible for asylum.  The Rule, which took effect on July 16, has only three narrow exceptions. Those exceptions are for those who applied for protection in a transit country and were denied it in a final judgment; who meet the definition of a "victim of severe form of trafficking in persons"; or who transited only through countries that are not parties to the 1951 Convention on the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or

2

the Convention Against Torture.  Mexico, the only country adjoining the southern border of the

United States, is a party to the 1951 Refugee Convention, the 1967 Refugee Protocol, and the

Convention Against Torture.

9.     The Rule thus bars virtually all noncitizens fleeing persecution from obtaining

asylum in the United States if they passed through another country on their way here, no matter

the conditions or purpose of their journey through that country or their prospect of protection,

rights, or permanent legal status in that country.  Accordingly, anyone fleeing persecution from

the ongoing humanitarian crisis in the countries that constitute the Northern Triangle (Honduras,

Guatemala, and El Salvador) who reasonably does not apply for protection while en route will be

categorically denied the opportunity to seek asylum in the United States and likely forced to

return to countries that are rife with danger and violence.  The Rule is a part of an unlawful effort

to significantly undermine, if not virtually repeal, the U.S. asylum system at the southern border,

and cruelly closes our doors to refugees fleeing persecution, forcing them to return to harm.

10.     The Rule directly violates Congress's clear requirement that for a noncitizen to be

denied asylum because of his or her relationship with a third country, the noncitizen had to be

firmly resettled in that third country or subject to a safe third country agreement, as well as

Congress's requirement that asylum cannot be categorically denied based on an asylum seeker's

route to the United States.  The Rule also violates the William Wilberforce Trafficking Victims

Protection Reauthorization Act of 2008 ("TVPRA") by denying unaccompanied immigrant

children the opportunity to seek protection in the United States in the first instance in a non-

adversarial setting. 8 U.S.C. § 1158(b)(3)(C).  It is arbitrary and capricious, as well.

11.     In addition, the Attorney General and Acting Secretary of Homeland Security

issued the Rule without prior notice and opportunity for public comment, and effective

3

immediately, in violation of the required procedural steps of the Administrative Procedure Act ("APA").

12.     Plaintiffs seek a declaration that these actions violate the INA, the APA, and the TVPRA, and an order enjoining the Rule.

## JURISDICTION AND VENUE

13.     This case arises under the APA, 5 U.S.C. § 701, *et seq.* and the INA, 8 U.S.C. § 1101, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331. This Court also has jurisdiction under 8 U.S.C. § 1252(e)(3). Judicial review is available under § 1252(e)(3) to determine if any regulation issued to implement expedited removal is unconstitutional or otherwise in violation of law.

14.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity and reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this district. Venue is further appropriate under 8 U.S.C. § 1252(e)(3)(A), which requires challenges to the validity of the expedited removal system be brought in this Court.

## PARTIES

15.     Plaintiffs are noncitizens who are in the United States and wish to seek asylum[1] and an organization that serves asylum seekers.

16.     Plaintiff I.A. is a twenty-five-year-old man from Pakistan. He is currently in U.S. Marshal's custody in San Diego, California, facing misdemeanor criminal charges for illegal entry under 8 U.S.C. § 1325. I.A. grew up as a practicing Sunni Muslim, but converted to Shia

---

[1] The Individual Plaintiffs are seeking leave to proceed under their initials in this case, and have filed a separate motion under seal as to that issue, with declarations setting forth the details provided here. They are referred to in this complaint using their initials, but their true names have been provided in conjunction with the motion to proceed under pseudonym.

Islam a few years ago. After he converted, Sunni extremists called him a traitor, threatened him, and beat him. On two separate occasions, I.A. was attacked so severely that he required hospitalization. Sunni members of I.A.'s family have also begun threatening his life and safety. He fled Pakistan because of this religious persecution. After he left Pakistan, I.A. traveled through various countries en route to the United States, and did not seek asylum in those countries. I.A. entered the United States at the southern land border on July 24, 2019, with the intention of seeking asylum here.

17.     Plaintiff E.B. is a twenty-year-old from Guatemala. He is currently in U.S. Marshal's custody in San Diego, California, facing misdemeanor criminal charges for illegal entry under 8 U.S.C. § 1325. E.B. fled Guatemala for two overlapping reasons. First, E.B. is an effeminate gay man who is in the process of coming to terms with his gender identity and expression. He is afraid to live openly in his country because of violence toward LGBT people. Second, he experienced significant physical and sexual abuse from his stepfather, who is a leader of the Mara Salvatrucha (MS) gang. E.B. tried to escape the physical and sexual abuse, including by filing a report with the police, but the government refused to intervene. E.B. passed through Mexico on his way to the United States, and though he initiated the process for seeking asylum there, he fled to the United States before that process was complete because while there he faced threats from his persecutors that led him to fear for his safety in Mexico. E.B. entered the United States on August 7, 2019, with the intention of seeking asylum in this country.

18.     Plaintiff L.C. is a woman from Guatemala who traveled to the United States with her minor son, M.X. They entered the United States on July 17, 2019, having crossed the Rio Grande at Reynosa, Texas. L.C. and M.X. were originally detained but have been released on parole and are currently living in Houston, Texas. L.C. came to the United States to escape

egregious domestic violence by her husband that included verbal abuse and physical and sexual violence.  On at least one occasion, this violence was so severe that L.C. had to be hospitalized. L.C. went to the government to seek a restraining order against her husband.  Although officials agreed to issue a temporary order, they repeatedly refused to enforce it, including when L.C.'s husband threatened her life and kidnapped their son.  During her journey through Mexico, L.C. and a group of migrants were extorted by armed drug cartel members who threatened to kill them.  L.C. did not apply for asylum in Mexico.  After she entered the United States, an asylum officer interviewed L.C. over a two-day span from July 23 to July 24, 2019.  During the interview, the officer explained that L.C. would only be considered for protection under the Convention Against Torture or for withholding of removal, and would not be eligible for asylum. L.C. received a decision from the asylum officer indicating that she established a reasonable fear of torture and she was referred to removal proceedings to seek that relief only.

19.     Plaintiff M.X. is the minor son of Plaintiff L.C. He traveled to the United States with his mother and seeks to be included on her application for asylum.

20.     Plaintiff L.A. is an English-speaking woman from Cameroon who entered the United States on July 25, 2019, via the San Ysidro Port of Entry in California.  She is currently detained at the Bergen County Jail in New Jersey.  L.A. came to the United States to seek asylum after she was arrested, detained, raped, and beaten for her participation in the Anglophone independence movement in Cameroon.  She traveled through various countries on her way to the United States, and did not seek asylum in those countries.  L.A. received a credible fear interview on August 12, 2019.

21.     Plaintiff A.L.G. is a woman from Honduras who traveled to the United States with A.G., her minor daughter.  They entered the United States on July 17, 2019, by crossing the

river at Reynosa, Texas. They were detained in Texas but have been released and are currently living in San Jose, California. A.L.G. fears persecution based on her identity as a lesbian. Her family and community have rejected her for her sexual orientation and have tried to forcibly "reform" her. A.L.G. fears expressing her sexual orientation openly. A.L.G. traveled through Guatemala and Mexico on her way to the United States, and did not seek asylum in either country. On July 23, 2019, A.L.G. was interviewed by an asylum officer who told her that she would not be considered for asylum because of the Rule. The officer proceeded to interview A.L.G. under the standard for withholding of removal and included a memo with the decision paperwork referring her to removal proceedings that indicated A.L.G. was barred from asylum.

22.     A.G. is the minor child of Plaintiff A.L.G. She traveled to the United States with her mother and seeks to be included on A.L.G.'s application for asylum.

23.     Plaintiff N.B. is a fifteen-year-old boy from Cameroon who entered the United States on August 1, 2019, via the San Ysidro Port of Entry. He is detained by the Office of Refugee Resettlement in Illinois. He fled Cameroon because he experienced persecution as an Anglophone Cameroonian. N.B. was beaten and detained by Cameroonian military officials who incorrectly believed he was part of the English-speaking separatist movement. He also faced forced recruitment by the separatist movement. N.B. traveled through various countries en route to the United States, and did not apply for asylum in those countries.

24.     Plaintiff Tahirih Justice Center is a nonprofit and non-partisan organization providing free legal immigration services to survivors of gender-based violence. Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law. Tahirih offers legal

representation and social services for individuals who seek protection, including asylum, in their immigration proceedings. Tahirih operates from five offices across the country, which are located in Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

25.     Defendant William Barr is the Attorney General of the United States. He is sued in his official capacity. In that capacity, he issued the interim final rule challenged in this suit. The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

26.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

27.     Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR"). He is sued in his official capacity.

28.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts limited review of negative credible fear determinations.

29.     Defendant Kevin K. McAleenan is the Acting Secretary of Homeland Security. He is sued in his official capacity. In that capacity, he issued the interim final rule challenged in this suit. He directs each of the component agencies within the Department of Homeland Security. In his official capacity, Defendant McAleenan is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum and other immigration benefits.

30.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship

and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration

and Customs Enforcement ("ICE").

31.     Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS.  He is sued in

his official capacity.

32.     Defendant USCIS is the sub-agency of DHS that, through its asylum officers,

conducts interviews of individuals who apply for asylum.

33.     Defendant Mark A. Morgan is the Acting Commissioner of CBP.  He is sued in

his official capacity.

34.     Defendant CBP is the sub-agency of DHS that is responsible for the initial

processing and detention of noncitizens who are apprehended near the U.S. border or who

present themselves at ports of entry.

35.     Defendant Matthew T. Albence is the Acting Director of ICE.  He is sued in his

official capacity.

36.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out

removal orders and overseeing immigration detention.

## BACKGROUND

**Asylum and Lesser Forms of Protection**

37.     Federal law provides several forms of protection for individuals fleeing

persecution and torture.  These forms of protection include asylum, 8 U.S.C. § 1158; withholding

of removal, 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture

("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No.

105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8

U.S.C. § 1231); 8 C.F.R. § 208.18.

38.     Asylum affords protection to individuals who have a "well-founded fear of persecution" on account of any one of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group.  8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42)(A).  Noncitizens subject to the Rule are ineligible for asylum.  They may, however, still be considered for withholding of removal and CAT relief.

39.     While withholding of removal also offers protection to individuals targeted on account of one of the five grounds, it requires an applicant to show that such persecution is more likely than not—a much higher standard of proof than that needed for asylum.  CAT relief likewise requires this higher standard of proof showing the applicant will be tortured.

40.     Congress also provided asylees with certain benefits that are critical to the noncitizen's safety and ability to successfully transition to a life free from persecution.  *See* 8 U.S.C. §§ 1159(b) (ability to adjust to the status of a lawful permanent resident); 1427 (ability to become a United States citizen after being lawfully admitted for permanent residence).  These are unavailable with withholding and CAT relief.  Critically, individuals who are granted asylum are able to work without restriction in the United States, 8 C.F.R. 274a.12(a)(5); recipients of withholding of removal, by contrast, must apply for work authorization annually, 8 C.F.R. 274a.12(a)(10), and there are lengthy delays in processing those renewal applications.  Finally, the spouse and children of a person granted asylum are likewise eligible for asylum.  8 U.S.C. § 1158(b)(3).  That benefit is not available with withholding of removal or CAT protection.

**The U.S. Asylum Process**

41.     There are three principal ways for an individual to seek asylum:

42.     First, where a noncitizen is not in any kind of removal proceedings, his or her application is "affirmative."  *See* 8 C.F.R. §§208.2(a), 208.9.  He or she files an application with

USCIS, and has an interview with an asylum officer.  This approach is also available to

unaccompanied immigrant children: even if they are subject to removal proceedings, they are

able to seek asylum affirmatively before the asylum office in a non-adversarial setting.  8 U.S.C.

§ 1158(b)(3)(C).

43.     Second, a noncitizen in ordinary removal proceedings, *see* 8 U.S.C. § 1229a, may

apply for asylum as a form of relief from removal, 8 C.F.R. § 208.2(b).  These applications are

referred to as "defensive" asylum applications.

44.     Third, Congress established an alternative removal process, "expedited removal,"

applicable to certain noncitizens who are arriving at ports of entry or apprehended after entering

without inspection.  *See* 8 U.S.C. § 1225(b)(1).

45.     As part of the expedited removal system, a noncitizen who expresses a fear of

return to his or her home country is entitled to a "credible fear" screening interview.  8 U.S.C.

§ 1225(b)(1)(B).  If the screening officer finds a "significant possibility" that the individual

"could establish eligibility for asylum," he or she is placed in regular removal proceedings and

may apply for asylum.  *Id.*  If an applicant fails to demonstrate a "significant possibility" of

persecution, she is subject to expedited removal.  Although that credible-fear decision is subject

to review by an immigration judge, it cannot be administratively appealed, and according to the

government, there is no federal court review of the legality of the expedited removal order.

**U.S. Law on Asylum Seekers and Third Countries**

46.     The modern asylum system was established by the Refugee Act of 1980, Pub. L.

96-212, 94 Stat. 102, which was incorporated into the INA.  The Act reflects "one of the oldest

themes in America's history—welcoming homeless refugees to our shores," and "gives statutory

meaning to our national commitment to human rights and humanitarian concerns."  Sen. Rep.

No. 256, 96th Cong., 1st Sess. 1 (1979), *reprinted in* U.S. Code Cong. and Admin. News 141, 141.

47.     The statutory provisions governing asylum represent an effort by Congress to bring the United States into compliance with its international obligations under the 1951 Refugee Convention and the 1967 Protocol. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987).

48.     It is and was obvious and well understood that asylum seekers often pass through third countries on their way to seeking refuge in the United States. Accordingly, in crafting the statutory provisions governing asylum, Congress took care to ensure that noncitizens within our country or at the border would be able to seek asylum even if they transited through another country to reach the United States.

49.     8 U.S.C. § 1158(a)(1) provides: "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." Congress thus was clear that entering the United States at or between ports of arrival is not a basis to categorically deny asylum to refugees. In so providing, Congress recognized that many asylum seekers would transit through another country before reaching the United States. That is because, except for Mexicans arriving at the southern border and Canadians arriving at the northern border, all asylum seekers arriving between ports of arrival at a land border necessarily transit through at least one other country before reaching the United States. In guaranteeing that entering the United States at or between ports of arrival could not be a basis for categorically

denying asylum, Congress also guaranteed that merely transiting through another country to reach the United States could not be a categorical barrier.

50.     Congress also spoke directly to the circumstances when a noncitizen may be deemed ineligible for asylum based on his or her relationship with a third country. Section 1158(b)(2)(A) specifically provides that a noncitizen shall be ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States." The plain text of the statute, agency regulations, and case law have long made clear that firm resettlement requires far more than merely transiting through another country.

51.     Under international law, firm resettlement requires more than transiting through a third country. For example, the 1951 United Nations Convention Relating to the Status of Refugees provides that it shall not apply to a person who "acquired a new nationality, *and* enjoys the protection of the country of his new nationality" or "is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country." Art. 1, §§ C(3), E, adopted July 28, 1951, 189 U.N.T.S. 150 (emphasis added).

52.     In 1980, the former Immigration and Naturalization Service ("INS") issued interim regulations providing that a noncitizen would be considered firmly resettled "if he was offered resident status, citizenship, or some other type of permanent resettlement by another nation and traveled to and entered that nation as a consequence of his flight from persecution." 8 C.F.R. § 208.14 (1981). The regulations further provided for an exception if the asylum applicant established "that the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of asylum/refuge that he was not in fact resettled." *Id.* Officers were to consider "the type of housing, whether permanent or temporary,

made available to the refugee, the types and extent of employment available to the refugee, and

the extent to which the refugee received permission to hold property and to enjoy other rights

and privileges (such as travel documentation, education, public relief, or naturalization) available

to others resident in the country." *Id.*

53.     The Attorney General amended the firm resettlement regulations in 1991.  The

definition of firm resettlement provided in those regulations is substantially the same as the

current firm resettlement regulations set out at 8 C.F.R. §§ 208.15, 1208.15.  The 1991 regulation

provided that a noncitizen would be "considered to be firmly resettled if, prior to arrival in the

United States, he entered into another nation with, or while in that nation received, an offer of

permanent resident status, citizenship, or some other type of permanent resettlement unless" he

could establish that "his entry into that nation was a necessary consequence of his flight from

persecution, that he remained in that nation only as long as was necessary to arrange onward

travel, and that he did not establish significant ties in that nation" or that "the conditions of his

residence in that nation were so substantially and consciously restricted by the authority of the

country of refuge that he was not in fact resettled."  8 C.F.R. § 208.15 (revised Jan. 1, 1991).

The regulation directed that the asylum officer and/or immigration judge undertake an

individualized inquiry and consider the following factors: "the conditions under which other

residents of the country live, the type of housing made available to the refugee, whether

permanent or temporary, the types and extent of employment available to the refugee, and the

extent to which the refugee received permission to hold property and to enjoy other rights and

privileges, such as travel documentation including a right of entry and/or reentry, education,

public relief, or naturalization, ordinarily available to others resident in the country." *Id.*

54.     Congress then adopted the current firm resettlement bar, 8 U.S.C.
§ 1158(b)(2)(A)(vi), in 1996, when it amended the INA in the Illegal Immigration Reform and
Immigrant Responsibility Act.  In so doing, it codified the regulatory definition of "firm
resettlement."

55.     The implementing regulation on firm resettlement was finalized in 2000, and is
substantively identical to the 1991 version.  It provides: "An alien is considered to be firmly
resettled if, prior to arrival in the United States, he or she entered into another country with, or
while in that country received, an offer of permanent resident status, citizenship, or some other
type of permanent resettlement unless he or she establishes: (a) That his or her entry into that
country was a necessary consequence of his or her flight from persecution, that he or she
remained in that country only as long as was necessary to arrange onward travel, and that he or
she did not establish significant ties in that country; or (b) That the conditions of his or her
residence in that country were so substantially and consciously restricted by the authority of the
country of refuge that he or she was not in fact resettled. In making his or her determination, the
asylum officer or immigration judge shall consider the conditions under which other residents of
the country live; the type of housing, whether permanent or temporary, made available to the
refugee; the types and extent of employment available to the refugee; and the extent to which the
refugee received permission to hold property and to enjoy other rights and privileges, such as
travel documentation that includes a right of entry or reentry, education, public relief, or
naturalization, ordinarily available to others resident in the country."

56.     Furthermore, Congress also spoke directly to the circumstances when noncitizens
may be ineligible for asylum on basis of their ability to receive protection in another country.
Section § 1158(a)(2)(A), the safe third country provision, provides that the Attorney General

15

may foreclose asylum only when he or she "determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States."

57.     These statutory provisions governing asylum and a noncitizen's relationship to or opportunity to apply for asylum in a third country, including 8 U.S.C. §§ 1158(a)(1), (b)(2)(A), and (b)(2)(A)(vi), represent a carefully crafted effort by Congress to satisfy its international obligations to protect those fleeing persecution and torture while also taking account of the need to share the burden of protecting asylum seekers with those countries capable of offering safety and full and fair asylum proceedings.

58.     Our immigration laws track international humanitarian law, under which protection of an individual fleeing persecution is paramount and individuals may not be required to seek protection in a country where they lack a genuine guarantee of safety and access to a functioning procedure, even if they transited through that country.

59.     The 1951 Refugee Convention and the 1967 Protocol do not require refugees to apply for protection in the first country where it could have been sought and do not require refugees to be returned to a country that was crossed in transit.

60.     The United Nations High Commissioner for Refugees ("UNHCR") has issued guidance on the "safe third country" concept, noting that the "primary responsibility to provide

protection rests with the State where asylum is sought." Asylum should not be refused "solely

on the ground that it could be sought from another State," and an asylum-seeker should not be

required "to seek asylum in a country with which he has not established any relevant links."

UNHCR's analysis provides significant guidance for courts on issues of refugee law. *See*

*Cardoza Fonseca*, 480 U.S. at 438-39 (relying on UNHCR guidance in interpreting refugee law).

61.     UNHCR has also explained that the mere fact that a country is a party to the 1951

Convention and/or its 1967 Protocol does not allow one to be required to seek asylum in that

country.

62.     Consistent with this long-standing guidance, UNHCR has publicly stated that the

Rule at issue here jeopardizes the right to *non-refoulement* and ignores the lack of effective

international protection in transit countries. *See* UNHCR Deeply Concerned About New U.S.

Asylum Restrictions (July 15, 2019), https://www.unhcr.org/en-

us/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-restrictions.html.

**The Interim Final Rule**

63.     On July 16, 2019, Defendant Barr, in his role as Attorney General, and Defendant

McAleenan, in his role as Acting Secretary of Homeland Security, promulgated an interim final

rule pursuant to 8 U.S.C. § 1158(b)(2)(C), which provides that the Attorney General may "by

regulation establish additional limitations and conditions, consistent with [§ 1158], under which

an alien shall be ineligible for asylum," and 8 U.S.C. § 1158(d)(5)(B), which provides that the

Attorney General may "provide by regulation for any other conditions or limitations on the

consideration of an application for asylum not inconsistent with this chapter."

64.     The Rule renders ineligible for asylum noncitizens who transit through another

country before arriving in the United States, with only extremely limited exceptions.

65.     Specifically, the Rule provides that "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after" the effective date of the Rule "after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States," shall be found ineligible for asylum unless one of three conditions is met: (1) "The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;" (2) "The alien demonstrates that he or she satisfies the definition of 'victim of a severe form of trafficking in persons' provided in 8 C.F.R. 214.11;" or (3) "The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment."

66.     The Rule implements expedited removal by amending 8 C.F.R. § 208.30(e). Pursuant to the Rule, noncitizens subject to expedited removal who seek protection will be screened by an asylum officer and the officer will determine whether the noncitizen is subject to the bar set out in the Rule.  If the asylum officer determines that the noncitizen is subject to the bar, the asylum officer will deny asylum and then apply the more onerous reasonable-fear standard, rather than the credible-fear asylum standard, to assess the noncitizen's claims for withholding of removal and protection under the Convention Against Torture.  A noncitizen who passes the reasonable-fear screening will be placed in removal proceedings where she will be permitted to apply for withholding and/or CAT protection.  A noncitizen may seek review of the

asylum officer's determination that he or she is subject to the eligibility bar before an immigration judge. If the immigration judge affirms the determination that the bar applies, and that the noncitizen has failed to pass the reasonable fear standard, the applicant will be subject to immediate removal. In other words, any person subject to the Rule's application in expedited removal will have to meet a higher standard to even get the chance to present her claim to an immigration judge for protection; if she cannot meet that higher standard, she will be removed without a full immigration hearing. And even for those who do satisfy the higher standard, the relief available will be significantly inferior.

67.     The Rule does not require any individualized assessment of the asylum system in the country or countries a noncitizen transited through en route to the United States, or any assessment of the asylum seeker's protection claims or reasons for not seeking protection in the transit country. It does not require an assessment of whether the transit country had a functioning asylum system capable of processing the asylum seeker's claim in a full and fair manner; whether the country was able to offer the asylum seeker effective protection against persecution or torture; whether the asylum seeker could even access—practically or legally—the asylum system; whether the asylum system would recognize the asylum seeker's particular claim for protection; or why the asylum seeker otherwise did not apply for protection. If, for example, an asylum seeker has a protection claim rooted in persecution based on sexual orientation, as is the case with Plaintiffs E.B. and A.L.G., but the transit country is as dangerous as the home country for LGBT people, the asylum seeker would nonetheless be subject to the Rule. So too if the asylum seeker faced threats to her safety in the transit country and staying to apply for asylum and receive a final judgment would have required her to risk further harm.

68.     The Rule further does not require that a transit country have signed the 1951

Refugee Convention, 1967 Protocol, and the Convention Against Torture for the asylum seeker

to be deemed ineligible for asylum in the United States. Rather, it is sufficient that the transit

country has signed only one of those instruments. An individual thus will be denied asylum for

transiting through a country that signed the Convention Against Torture but not the 1951

Refugee Convention without applying for protection, even if the individual had a claim for

asylum but not for relief under the Convention Against Torture.

69.     Many countries that are plainly unable to provide adequate protection to asylum

seekers and lack full and fair asylum systems nonetheless are signatories to the 1951 Refugee

Convention, including Afghanistan, Chad, the Democratic Republic of Congo, Iran, Somalia,

and Sudan. The U.S. State Department has recognized in its Country Reports that many

signatories to the Convention do not adequately protect refugees or lack adequate asylum

processing systems. For example, Egypt is a signatory to the Convention, but according to the

State Department, Egypt's "laws do not provide for granting asylum or refugee status, and the

government has not established a comprehensive legal regime for providing protection to

refugees." Similarly, Angola is a signatory to the Convention, but according to the State

Department, "[t]he law provides for the granting of asylum or refugee status, but the law did not

function during the year."

70.     The Rule contains no exception for unaccompanied children as defined in 6

U.S.C. § 279(g). They, too, must apply for protection in a country through which they transit or

they will be deemed ineligible for asylum in the United States, irrespective of their age,

knowledge of or ability to understand the Rule's requirements, or knowledge of or ability—

practical or legal—to access the asylum system in a transit country. By contrast, Congress

expressly exempted unaccompanied children from the safe third country exception in the INA.
*See* 8 U.S.C. § 1158(a)(2)(E).  The Rule fails to acknowledge, much less consider, the unique
needs of unaccompanied children. The Rule also nullifies the non-adversarial system afforded to
unaccompanied children.  Section 1158(b)(3)(C) allows an unaccompanied child the opportunity
to present an asylum claim to an asylum officer in the first instance.  This sequencing ensures
that, when a child recounts traumatic and sensitive information for the first time, he may do so in
a non-adversarial setting.  Under the Rule, though, a child must proceed directly to an
immigration judge because asylum officers do not have authority to order withholding of
removal or protection under the Convention Against Torture.

71.     Under the Rule, asylum seekers with the financial means, time, and other
resources required to obtain travel documents, a visa, and plane tickets to the United States are
still able to access asylum.  But asylum seekers who are forced to flee immediately because of
exigent danger, and so lack the time to make such preparations, as well as asylum seekers
without adequate financial resources, will be automatically denied without consideration of their
individual circumstances.

72.     Because the Rule provides that the eligibility bar will not apply to individuals
who have received final judgments from other countries denying them protection, individuals
whose asylum claims have already been formally rejected are still considered eligible for asylum
in the United States, while individuals whose claims have never been rejected are considered
ineligible.

73.     The Rule's findings and the administrative record utterly fail to support the core
premises of the Rule.  In fact, the administrative record contains a mountain of evidence that
migrants face grave dangers in transit countries, whose asylum systems are patently inadequate

in multiple ways—critical considerations that the agencies failed to even mention, much less address, in adopting the Rule.

74.     On July 15, 2019, Defendant James R. McHenry, Director of the Executive Office for Immigration Review in the Department of Justice, issued guidance entitled "Guidelines Regarding New Regulations Governing Asylum and Protection Claims." The Guidelines review the substance of the Rule and the screening process it establishes.

75.     On the same day, John Lafferty, head of USCIS's asylum division, also advised asylum officers regarding the new Rule. Lafferty informed asylum officers that the division was "being asked to adapt and to do so with very little time to train and prepare."

76.     The APA generally requires a period of public notice and comment on proposed regulations to ensure that agency actions are transparent, lawful, and appropriately vetted. It also requires that new regulations not go into effect until 30 days after publication. Defendants issued the Rule without following either of these statutory obligations. Instead, Defendants claimed "good cause" to bypass the notice-and-comment procedures normally required for a rulemaking pursuant to 5 U.S.C. § 553(b)(B), and the 30-day waiting period that is required even where notice and comment are not, 5 U.S.C. § 553(d). They also invoked the "foreign affairs" exception to those procedures. 5 U.S.C. § 553(a)(1). Neither of those exemptions is properly applicable.

**The Administration's Persistent Attacks on Asylum Seekers**

77.     The new Rule bears stark resemblance to the November 8, 2018 interim final rule ("2018 Rule"), also enacted pursuant to 8 U.S.C. § 1158(b)(2)(C), and President Trump's signed 2018 Proclamation entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" ("2018 Proclamation"). The 2018 Rule provided that all

persons subject to a presidential proclamation concerning the southern border issued pursuant to the INA § 212(f), 8 U.S.C. § 1182(f), or INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), were ineligible for asylum. The Proclamation suspended the entry of all persons entering without inspection at the southern border.

78.     Together, the 2018 Rule and 2018 Proclamation barred people from obtaining asylum if they entered the United States somewhere along the southern border other than a designated port of arrival—in direct violation of Congress's clear command that manner of entry cannot constitute a categorical asylum bar.  That bar was quickly enjoined.

79.     The Rule at issue here bars a similar group of people in a categorical fashion— noncitizens who transit through another country prior to reaching the southern border.  Indeed, the new Rule is more draconian than its 2018 counterpart because it forecloses the protection of asylum to those who seek asylum even at a port of entry.  As such, asylum seekers coming by land from a country other than a country contiguous to the United States—such as those from the Northern Triangle—are left with only two more limited forms of protection—withholding of removal and protection under the Convention Against Torture—regardless of whether they present themselves at a port of arrival.

80.     The new Rule is the latest in a series of attacks on asylum seekers and a further attempt to undermine the statutory provisions governing asylum.

**Asylum Seekers at the Southern Border**

*Dire Conditions in Central America Have Prompted Many to Seek Refuge Elsewhere*

81.     Individuals who arrive at the southern border seeking protection in the United States through the asylum process, including unaccompanied children, are fleeing some of the most dangerous countries in the world.

82.     Although asylum seekers come to the southern border from all over the world, many come from El Salvador, Guatemala, and Honduras, countries known as the "Northern Triangle." According to a recent report from UNHCR, these countries are experiencing epidemic levels of violence. Human rights groups have compared the levels of violence in this region to those typically seen in war zones.

83.     Those who leave often are running from life-threatening situations, leaving everything behind to make a dangerous journey. In particular, violence against women, children, and members of the LGBT community, by armed criminal groups has escalated dramatically in Central America, and those governments have been unable or unwilling to provide effective protection.

84.     Asylum seekers fleeing their home countries in Central America face an arduous journey to the United States, involving a high risk of violence, including sexual assault, along the way.

85.     Many asylum seekers from Central American have no choice but to travel by land to the United States due to documentation requirements that would be necessary to board a plane, as well as financial constraints.

86.     The vast majority of asylum seekers from Central America thus arrive at the southern border after traveling by land across one or more countries. Those coming from Guatemala necessarily transit through Mexico, and those coming from El Salvador and Honduras transit through Guatemala and Mexico.

87.     Many of the migrants coming to the southern border have legitimate claims to asylum.

88.     According to UNHCR, in fiscal year 2015, 82 percent of the women from El Salvador, Guatemala, Honduras, and Mexico who were subject to a credible fear screening by an asylum officer were found to have a significant possibility of establishing eligibility for asylum or protection under the Convention Against Torture.

89.     Between fiscal years 2014 and 2016, 12,350 people from El Salvador, Guatemala, and Honduras were granted asylum.

*Guatemala Is Not Safe for Asylum Seekers and Lacks a Fair, Functioning Asylum System*

90.     For most asylum seekers, remaining in Guatemala and seeking protection there is not an option. The country lacks a full and fair asylum processing system, and is often extremely dangerous for migrants.

91.     According to the U.S. State Department, rape, violence against women, trafficking, violence against LGBTQ persons, gang recruitment of children, and corruption are serious issues in Guatemala.

92.     The State Department's Overseas Security Advisory Council reports that "Guatemala remains among the most dangerous countries in the world" and has an "alarmingly high murder rate" that "appears driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable."

93.     Guatemala was in the top four countries whose nationals were granted asylum in the United States in fiscal years 2015, 2016, and 2017.

94.     Guatemala's asylum system is brand new and barely functioning.

95.     Guatemala's new migration code only went into effect in May 2017.  That law

requires implementing regulations, which were only issued in April 2019 and have not yet been

made public.

96.     According to the U.S. State Department, UNHCR "reported that identification

and referral mechanisms for potential asylum seekers" in Guatemala "were inadequate," and

"[b]oth migration and police authorities lacked adequate training concerning the rules for

establishing refugee status."

97.     According to the UNHCR, only 262 people applied for refugee status in

Guatemala between January and November 2018, and that number was a 75 percent increase

from the prior year.  Since 2015, Guatemala has received on average fewer than 100 cases per

year for asylum processing.  In the last two years, it has received about 350 applications for

asylum and only decided roughly 20 to 30 asylum cases.

98.     There are very few officials working on the asylum process in Guatemala, and its

capacity to handle asylum claims is extremely limited.

99.     The Rule is silent as to Guatemala's asylum system and ability to protect migrants

from persecution or torture.  It completely fails to acknowledge that Guatemala's asylum system

is barely functioning, or to consider the effect of that fact on the desirability or legality of the

Rule.

*Mexico Is Not Safe for Asylum Seekers and Lacks a Fair, Functioning Asylum System*

100.     For most asylum seekers, remaining in Mexico and seeking protection there is not

an option.  The country lacks a full and fair asylum processing system, and is often extremely

dangerous for migrants.

101.    According to the U.S. State Department's 2017 Mexico Country Report, "violence against migrants by government officers and organized criminal groups" is one of "[t]he most significant human rights issues" in Mexico.  The State Department also reported in 2018 that the dangers that forced many Central American migrants to flee their homes are likewise present in Mexico, as the presence of Central American gangs has "spread farther into the country and threatened migrants who had fled the same gangs in their home countries," that there were reports of migrants being victimized "by criminal groups and in some cases by police, immigration officers, and customs officials," that "[t]here were media reports that criminal groups kidnapped undocumented migrants to extort money from migrants' relatives or force them into committing criminal acts on their behalf," that "[t]here were numerous instances of armed groups limiting the movements of migrants, including by kidnapping and homicides," and that there were "5,824 reported crimes against migrants" and "99 percent of the crimes were unresolved" at the federal level.

102.    Migrants in Mexico are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms.  Lesbian, gay, bisexual, and transgender persons, as well as people with indigenous heritage, regularly have been subject to persecution in Mexico.  Children in particular are at risk of robbery, sexual violence, kidnapping, femicide, extortion, and threats.

103.    Mexico experienced its highest number of murders recorded in 2018, up 33% from 2017, which previously was the highest number recorded.

104.    President Trump has acknowledged that Mexico is not a safe place, tweeting on January 31, 2019: "Very sadly, Murder cases in Mexico in 2018 rose 33% from 2017, to 33,341." He further stated that the situation in Mexico is "[w]orse even than Afghanistan."

105.     The asylum system in Mexico is not adequate to protect the rights of asylum

seekers.  Among other problems, Central American asylum seekers in Mexico face a substantial

risk of being involuntarily repatriated to the countries they have fled.  Intergovernmental and

human rights organizations have documented widespread instances of Mexican officials

returning Central American migrants to their home countries despite their fears of persecution or

torture, without any meaningful process.

106.     The U.S. Department of State has noted "incidents in which immigration agents

had been known to threaten and abuse migrants to force them to accept voluntary deportation

and discourage them from seeking asylum."  It further noted that "NGOs reported bribes

sometimes influenced the adjudication of asylum petitions and requests for transit visas."

107.     Data from the Mexican government indicates that very few of the children who

are apprehended by Mexican immigration authorities are recognized as refugees or given other

formal protection in Mexico, and that Mexican immigration authorities routinely fail to inform

detained children about their right to seek protection and fail to adequately screen them for

refugee recognition.

108.     Despite Mexican law prohibiting the detention of children for migration purposes,

many children continue to be detained by Mexico's immigration agency.  Conditions in Mexican

detention centers have been widely reported to be harmful to children and in violation of

international law.  Mexico also sometimes deports unaccompanied children to danger, in many

cases in violation of its own child protection laws.

109.     President Trump has encouraged Mexico to deport individuals who arrived in

"caravans" regardless of their claims for asylum or other forms of protection: "Mexico should

move the flag waving Migrants, many of whom are stone cold criminals, back to their countries.

Do it by plane, do it by bus, do it anyway [sic] you want, but they are NOT coming into the U.S.A. We will close the Border permanently if need be."

110.     The Rule offers no analysis or evidence as to the adequacy of Mexico's asylum system and ability to protect migrants from persecution or torture. It notes only the number of asylum applications Mexico received in 2016, 2017, and 2018.

111.     Despite the growing number of asylum applications, Mexico's Commission for Refugee Assistance ("COMAR") has not grown its personnel or its budget accordingly. Mexico's asylum system is strained as a result. COMAR has failed to make a decision within the time limits provided by Mexico law on 22,000 asylum cases, and more than 50,000 asylum claims are pending.

112.     COMAR's website lists only four offices. None of these offices are near Mexico's northern border.

113.     Asylum seekers in Mexico have only 30 days to apply for asylum.

114.     The Rule is silent as to the quality and capacity of Mexico's asylum system and Mexico's ability to protect migrants from persecution or torture.

**Harms to Plaintiffs**

115.     Absent declaratory and injunctive relief, each of the Plaintiffs will be severely and irreparably harmed by the Rule. Each of the Individual Plaintiffs will be severely limited in their ability to access protection for relief, as they will be categorically ineligible for asylum. For those who cannot meet the higher standard for withholding of removal or CAT relief, they will be actually removed from the United States. And even those who are granted withholding or CAT relief will be deprived of the benefits attendant to asylum.

116.   Under the Rule, the Individual Plaintiffs are barred from seeking asylum in the United States because they entered the country through the southern border on or after July 16, 2019, after having transited through at least one third country in which they did not first apply for asylum and obtain a final denial.

117.   The Individual Plaintiffs face the risk of removal to countries in which they face serious threats of persecution and violence.

118.   The Rule deprives the Individual Plaintiffs of the other benefits of asylum, including derivative eligibility for family members, work authorization, and a path to citizenship. These benefits are not available in connection with other forms of protection from removal.

119.   Plaintiff Tahirih Justice Center is a nonprofit and non-partisan organization that provides free legal immigration services, including asylum services, to survivors of gender-based violence.  Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law.  Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.  Many of Tahirih's asylum-seeking clients arrive through the southern border having transited through another country while en route to the United States.  Tahirih's clients enter the United States at various places across the entire southern border.  The Rule frustrates Tahirih's mission, requires them to expend significant resources they otherwise would spend in other ways to address the consequences of the policy, and jeopardizes their funding streams.

120.    The Rule's immediate promulgation denied Plaintiffs an opportunity to comment before the Rule went into effect, and denied them the ability to prepare for its serious and harmful impacts.

## FIRST CLAIM FOR RELIEF

### (Violation of Immigration and Nationality Act)

121.    With only certain narrow exceptions, the Rule bars asylum for anyone who transits through another country and does not apply for protection there before reaching the southern land border of the United States.  Asylum officers and immigration judges are required to follow the Rule.

122.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

123.    The Rule is contrary to law, including the asylum law provisions in the INA, among them 8 U.S.C. §§ 1158(a)(1), 1158(a)(2)(A), 1158(b)(2)(A)(vi), 1158(b)(2)(C), and 1158(d)(5)(B).

124.    The Rule is also contrary to the expedited removal provisions in the INA, 8 U.S.C. § 1225(b).

## SECOND CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act, Notice & Comment)

125.    The APA requires notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  The Attorney General and Acting Secretary of Homeland Security failed to provide notice and an opportunity to comment in a timely manner.

126.    The Attorney General and Acting Secretary of Homeland Security have not articulated reasons sufficient to show good cause why this requirement is inapplicable, nor is the foreign affairs exception applicable.

## THIRD CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act, 30-day Notice)

127.    The APA requires that a regulation be published "no less than 30 days before its effective date."  5 U.S.C. § 553(d).  The Attorney General and Acting Secretary of Homeland Security failed to publish the Rule 30 days before its effective date.

128.    The Attorney General and Acting Secretary of Homeland Security have not articulated reasons sufficient to show good cause why this requirement is inapplicable, nor is the foreign affairs exception applicable.

## FOURTH CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act, Arbitrary & Capricious)

129.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

130.    Among other reasons, the Rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; failed to consider or articulate a reasoned explanation for their decision to subject unaccompanied children to the Rule; and offered explanations for their decision that run counter to the evidence before the agency.

## FIFTH CLAIM FOR RELIEF

### (Violation of the TVPRA)

131.    The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") provides specific asylum protections to unaccompanied children.  *See* 8 U.S.C. § 1158 (b)(3)(C).

132.    The Rule is contrary to the system established by the TVPRA.  Under the Rule, unaccompanied children subject to the Rule are ineligible for asylum.  Because asylum officers do not have authority to order withholding of removal or protection under the Convention Against Torture, the asylum officer will, under the Rule, be unable to grant any relief to an unaccompanied minor such as N.B., no matter how strong the claims.

133.    As a result, an unaccompanied minor like N.B. will never be eligible to be granted any fear-based relief in a non-adversarial setting, and must always present the traumatic and sensitive details of a claim for protection in the adversarial proceeding that occurs before an immigration judge (and even then, for lesser forms of relief).  The Rule thus upends the non-adversarial process mandated by Congress in 8 U.S.C. § 1158 (b)(3)(C).

134.     Because Defendants' actions under the Rule are contrary to the TVPRA, they violate APA Section 706(2)(A) because they are "not in accordance with law" and APA Section 706(2)(C) because they exceed Defendants' statutory authority.

135.     Plaintiff N.B. and other unaccompanied minors are irreparably harmed by losing their statutory right to seek asylum in a non-adversarial process before an asylum officer.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   A declaration pursuant to 28 U.S.C. § 2201 that the interim final rule is unlawful and invalid;

b.   A nationwide injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the interim final rule;

c.   An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

d.   Such other and further relief as the Court deems equitable, just, and proper.

Dated: August 19, 2019

Respectfully submitted,

Celso J. Perez (D.C. Bar No. 1034959)
Lee Gelernt**
Omar Jadwat**
Anand Balakrishnan**
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Katrina Eiland**
Cody Wofsy**
Julie Veroff**
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

Charles George Roth**
Keren Hart Zwick**
Gianna Borroto**
NATIONAL IMMIGRANT JUSTICE
CENTER
208 LaSalle Street, Suite 1300
Chicago, IL 60604
(312) 660-1370

*Attorneys for Plaintiffs*

***Pro hac vice application forthcoming*